SCHEDULED FOR ORAL ARGUMENT ON JANUARY 13, 2017

————————————————

No. 16-5203

————————————————

THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————————

STATE OF NORTH DAKOTA,

*Intervenor-Defendant – Appellant*,

v.

GOVERNMENT OF THE PROVINCE OF MANITOBA, *et al*.,

*Plaintiffs – Appellees*

SALLY JEWELL, SECRETARY, U.S. DEPARTMENT OF THE INTERIOR, *et al*.,

*Defendants – Appellees*

————————————————

*On Appeal from the United States District Court for the District of Columbia in Case No. 1:02-cv-02057-RMC, Rosemary M. Collyer, United States District Judge*
————————————————

**Appellant State of North Dakota's Opening Brief**

————————————————

Submitted By

Nessa Horewitch Coppinger (D.C. Bar No. 477467)
Fred R. Wagner (D.C. Bar No. 416009)
Special Assistant Attorneys General
1350 I Street, NW Suite 700
Washington, DC 20005-3311
Phone: (202) 789-6053
Fax: (202) 789-6190
Emails: ncoppinger@bdlaw.com
          fwagner@bdlaw.com


Jennifer L. Verleger
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501
Phone: (701) 328-3640
Fax: (701) 328-4300
Email: jverleger@nd.gov

*Attorneys for Appellant*
*State of North Dakota*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

(A)   Parties and Amici.

1.   The State of North Dakota ("North Dakota") is Intervenor-Defendant in the District Court and an Appellant in this Court.

2.   The Government of the Province of Manitoba ("Manitoba") and the State of Missouri, ex rel Chris Koster, Missouri Attorney Generals' Office ("Missouri") are Plaintiffs in the District Court and are Appellees in this Court.

3.   Sally M.R. Jewell, in her official capacity as Secretary of the Interior; United States Department of the Interior, Bureau of Reclamation ("Reclamation"); Estevan Lopez, in his official capacity as Commissioner, Reclamation; Michael J. Ryan, in his official capacity as Regional Director, Great Plains Region, Reclamation; David Rosenkrance, in his official capacity as Dakotas Area Manager, Reclamation; United States Army Corps of Engineers; and Eric K. Fanning, in his official capacity as Secretary of the United States Army (collectively "Federal Defendants") are Defendants in the District Court. The Federal Defendants took no position as to the underlying

i

motion in the District Court. The Federal Defendants have not participated in this appeal.

4.    No amici have participated in the District Court since 2010. Appellant North Dakota is not aware of any amici that intend to participate in this appeal. The following amici participated in the District Court between 2002 and 2010: City of Minot, North Dakota; Government of Canada; National Wildlife Federation; Great Lakes Environmental Law Center; Minnesota Conservation Federation; South Dakota Wildlife Federation; State of Missouri (prior to Missouri filing its own lawsuit); Minnesota Center for Environmental Advocacy; and Missouri Coalition for the Environment.

(B)    **Ruling Under Review.** The ruling under review is the District Court's June 14, 2016 Minute Order in *Government of Manitoba v. Norton et al.*, No. 1:02-cv-02057-RMC (Hon. Rosemary M. Collyer).

(C)    **Related Cases.** This matter up for review has not previously been before this Court. Counsel are aware of no related cases currently pending in this Court or in any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED
    CASES ............................................................................................i

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY ....................................................................................... vii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF ISSUES ...................................................................1

I.     STATEMENT OF THE CASE .................................................2

     A.    FACTUAL BACKGROUND ........................................2

     B.    THE CURRENT NEPA LITIGATION ...........................6

     C.    NORTH DAKOTA'S MOTION TO MODESTLY
         AMEND THE EXISTING INJUNCTION .......................12

II.    STANDARD OF REVIEW .....................................................15

III.   SUMMARY OF ARGUMENT ................................................16

IV.   ARGUMENT ........................................................................18

     A.    CHANGED CIRCUMSTANCES DICTATE A
         RECONSIDERATION OF THE SCOPE OF THE
         INJUNCTION .........................................................19

     B.    EQUITABLE FACTORS TIP HEAVILY TOWARDS
         ALLOWING NORTH DAKOTA THE MODEST
         RELIEF IT SEEKS ...................................................23

         1.    Plaintiffs Will Suffer No Harm from the Paper
            Design Work North Dakota Proposes......................24

         2.    The Balance of Equities Tips Towards North
            Dakota ...............................................................27

         3.    Modifying the Injunction Would be in the Public
            Interest...............................................................28

         4.    There is No Substantial Likelihood Manitoba and
            Missouri Will Prevail on the Merits .......................29

V.    CONCLUSION......................................................................31

FED. R. APP. P. 32(a)(7)(C) CERTIFICATE OF COMPLIANCE .......33

CERTIFICATE OF SERVICE ..............................................................34

ADDENDUM: STATUTES, REGULATIONS AND RULES ........................... A-1

## TABLE OF AUTHORITIES

**Cases**

*Califano v. Sanders*,
    430 U.S. 99 (1977) ........................................................................ 21

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ...................................................................... 21

*CSX Transp., Inc. v. Williams*,
    406 F.3d 667 (D.C. Cir. 2005) ..................................................... 16

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ................................................... 29

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    53 F. Supp. 3d 1 (D.D.C. 2014) ................................................... 25

*Ethyl Corp. v. EPA*,
    541 F.2d 1 (D.C. Cir. 1976) ......................................................... 21

*Gov't of Manitoba v. Norton*,
    398 F. Supp. 2d 41 (D.D.C. 2005) ................................................. 2

*Gov't of Manitoba v. Salazar*,
    691 F. Supp. 2d. 37 (D.D.C. 2010) ................................................ 9

*Gov't of Manitoba v. Salazar*,
    926 F. Supp. 2d 189 (D.C. Cir. 2013) ......................................... 20

*\*Horne v. Flores*,
    557 U.S. 433 (2009) ........................................................ 16, 18, 23

*\*In re Rail Freight Fuel Surcharge Antitrust Litig. MDL, No. 1869*
    725 F.3d 244 (D.C. Cir. 2013) ..................................................... 15

*\*Karsner v. Lothian*,
    532 F.3d 876 (D.C. Cir. 2008) ..................................................... 15

*Lyles v. United States*,
    759 F.2d 941 (D.C. Cir. 1985) ..................................................... 15

*Marino v. Drug Enf't Admin.*,
    685 F.3d 1076 (D.C. Cir. 2012) ................................................... 16

*Mercado-Salinas v. Bart Enters. Int'l, Ltd.*,
    671 F.3d 12 (1st Cir. 2011) .......................................................... 27

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................ 23, 28, 29

*Nat'l Audubon Soc'y v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) ....................................................... 25

*Pacific Rivers Council v. U.S. Forest Service*,
    942 F. Supp. 2d 1014 (E.D. Cal. 2013), ..................................... 21

*Petties ex rel. Martin v. District of Columbia*,
    662 F.3d 564 (D.C. Cir. 2011) .......................................................... 19, 20
*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ...........................................................................29
*Rufo v. Inmates of the Suffolk Cty. Jail*,
    502 U.S. 367 (1992) ...........................................................................19
*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ...........................................................27
*United States v. W. Elec. Co., Inc.*,
    46 F.3d 1198 (D.C. Cir. 1995) ...........................................................19
*Winter v. Nat'l Res. Defense Council*,
    555 U.S. 7 (2008) .................................. 1, 16, 17, 23, 24, 26, 27, 28, 30
*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................... 24, 25

**Statutory Authorities**

28 U.S.C. § 1292(a)(1) ..........................................................................1
28 U.S.C. § 1331 ...................................................................................1
28 U.S.C. § 1337 ...................................................................................1
28 U.S.C. § 1361 ...................................................................................1

**Rules and Regulations**

40 C.F.R. § 141.62 ................................................................................4
*Fed. R. Civ. P. 60(b)(5) .......................................................... 18, 20, 23

The relevant statutes, regulations, rules are set forth in an addendum to this
Opening Brief.

**Additional Authorities**

USGS Press Release: *Modeling the Mouse: Future Flood Risk for the
    Souris River*, U.S. Geological Survey (February 24, 2016),
    https://www.usgs.gov/news/modeling-mouse-future-flood-risk-souris-
    river .....................................................................................................5
*U.S. Geological Survey Drip Calculator* http://water.usgs.gov/edu/activity-
    drip.html (last modified May 2, 2016) ...............................................6

*Authorities upon which Appellant North Dakota chiefly relies are marked with
asterisks.

## GLOSSARY

| | |
|---|---|
| **EIS** | Environmental Impact Statement |
| **NAWS Project** | Northwest Area Water Supply Project |
| **NEPA** | National Environmental Policy Act |
| **ppb** | parts per billion |
| **USGS** | United States Geological Survey |

**JURISDICTIONAL STATEMENT**

Before the District Court, Appellee Manitoba asserted jurisdiction under 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1337 (Interstate Commerce), and 28 U.S.C. § 1361 (Mandamus). In a case that was later consolidated with the present matter, Appellee Missouri asserted jurisdiction under 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1), in which Congress provided appellate jurisdiction over certain interlocutory district court orders, including the denial of motions to modify injunctions. In the present case, the District Court denied North Dakota's motion to modify an injunction on June 14, 2016. North Dakota's Notice of Interlocutory Appeal was timely filed on July 1, 2016 (ECF No. 244),[1] and docketed in this Court on July 14, 2016.

**STATEMENT OF ISSUES**

Whether the District Court erred in denying the State of North Dakota's Motion to Modify Injunction by: 1) failing to find that changed circumstances merited reconsideration of the scope of the existing injunction; and 2) failing to apply the factors prescribed by *Winter v. Nat'l Res. Defense Council,* 555 U.S. 7, 20 (2008), in refusing to make a minor modification to the injunction to allow paper design work on a biota water treatment plant.

---

[1] Unless otherwise specified, citations in this brief that reference electronic case filing numbers "(ECF No.__)" are for the District Court case before Judge Rosemary M. Collyer, case no. 1:02-cv-02057-RMC.

## I.    STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND

Citizens in northwest North Dakota have been plagued by inadequate drinking water for decades.  *See, e.g., Gov't of Manitoba v. Norton*, 398 F. Supp. 2d 41, 67 (D.D.C. 2005) (recognizing the "long history of water-supply problems" in the region); Final Supplemental Environmental Impact Statement ("EIS") at 2015 AR 2015_107 Page 23 (App. 719).[2]  The Northwest Area Water Supply Project ("NAWS Project" or "the Project")[3] was first conceived thirty years ago to address these drinking water problems.  *Id.* at 2015 AR 2015_107 Pages 23, 26 (App. 719, 722).  Decades later, citizens of northwest North Dakota are still waiting for a long-term solution to their increasingly urgent water needs.

The area to be served by the Project ("Project communities") includes a ten-county region, eleven cities or municipalities, and four rural water associations or districts.  *Id.* at 2015 AR 2015_107 Page 23 (App. 719).  The Project communities are home to approximately 80,000 citizens.  Water Needs Assessment Technical Report at 2015 AR 2015_114 Page 19 (App. 215).  Most Project communities do

---

[2] Citations in this brief to Reclamation's Administrative Record (Bates endorsed "____AR____") were filed in the District Court case 1:02-cv-02057-RMC.  *See* ECF Nos. 42, 56, 75, 121, 223, 253-61 (*see* docket at App. 1-49).

[3] The Bureau of Reclamation ("Reclamation") is the lead agency for the Project. The State of North Dakota is the Project sponsor and has been a cooperating agency for Reclamation's analysis of the Project for compliance with the National Environmental Policy Act ("NEPA").

not meet secondary drinking water standards under the Safe Drinking Water Act, and the City of Kenmare's groundwater source violates primary drinking water standards for arsenic. *Record of Decision for the NAWS Project Final Supplemental EIS* (August 21, 2015) ("Record of Decision") at 2015 AR 2015_100 Page 5 (App. 1941).

Additionally, many Project communities lack a sufficient quantity of water. *Id*. For example, the City of Minot – the largest city that would be served by the Project – is withdrawing from its current aquifer water sources at unsustainable levels. Final Supplemental EIS Appendix B – Community/Water Systems Data ("Final Supplemental EIS Appendix B"), at 2015 AR 2015_103 Page 31 (App. 1205). Because water quality in the local aquifers decreases with depth, as more water is extracted from bedrock, the drinking water quality declines. North Dakota's Motion for Summary Judgment and Motion to Lift Injunction Exhibit B – North Dakota State Water Commission Recommended Decision (May 2, 2014), at 108-09, ECF No. 242-3. Minot's water already does not meet federal secondary drinking water standards for total dissolved solids, iron, and manganese levels. Final Supplemental EIS Appendix B, at 2015 AR 2015_103 Page 31 (App. 1205). Additionally, arsenic levels in Minot have nearly tripled from 1.23 parts per billion

("ppb") in 2002 to 3.41 ppb as of the latest measurement.[4]  North Dakota's Reply

Brief Supporting Motion to Modify Injunction  ("North Dakota's Reply Brief")

Exhibit C – City of Minot Water Quality Report, at 2, 6, ECF No. 233-3 (App.

176, 180) .

Minot, however, is among the more fortunate of the Project communities.

For that reason, Minot has entered into temporary contracts to provide water from

its groundwater wells to meet peak-day needs for the cities of Berthold and

Kenmare, and for average-day needs for the cities of Burlington, Mohall, and

Sherwood, in addition to the Upper Souris Water Users District, All Seasons Water

Users District, and West River Water and Sewer District.  Final Supplemental EIS

at 2015 AR 2015_107 Page 28 (App. 724); Final Supplemental EIS Appendix B, at

2015 AR 2015_103 Pages 25-37 (App. 1199-1211).  These temporary contracts are

scheduled to expire in 2018, and may end sooner due to the unsustainable water

withdrawals from the aquifers supplying Minot.  Final Supplemental EIS at 2015

AR 2015_107 Page 28 (App. 724).  When these agreements end, citizens in the

communities listed above may face an immediate water crisis.

Furthermore, as Manitoba acknowledged in briefing before the District

Court, the significant decline in aquifer levels has occurred in what the United

---

[4] Arsenic in drinking water has been linked to skin, liver, lung, kidney, and bladder
cancer.  NAWS Project – Pre-final Design Summary of Safe Drinking Water Act
Existing and Proposed Standards (April 1993), 2003 AR at 01191.  The federal
limit for arsenic in drinking water is 10.0 ppb.  40 C.F.R. § 141.62(b)(16).

States Geological Survey ("USGS") describes as a "wet climate period" in the area.  USGS Press Release: *Modeling the Mouse: Future Flood Risk for the Souris River* ("USGS Press Release"), *U.S. Geological Survey* (February 24, 2016), https://www.usgs.gov/news/modeling-mouse-future-flood-risk-souris-river; Manitoba's Response in Opposition to Motion to Modify Injunction ("Manitoba's Opposition") at 13-14, ECF No. 230 (App. 133-34).  This period began in 1970, during which time, Project community aquifers have significantly decreased.  USGS Press Release; North Dakota's Reply Brief Exhibit A, ECF No. 233-1 (App. 172-74) (hydrographs depicting aquifers supplying Minot).  An end to this "wet climate period" in the near term – the USGS Press Release states that it is unclear how long the period will last – could precipitate a drinking water crisis in the Project communities even sooner than it will otherwise come.  USGS Press Release.

The Project would provide a badly needed new source of drinking water to the Project communities.  However, Manitoba and Missouri oppose any form of the Project that would use water from the nearby Missouri River.  Manitoba fears that, despite the advanced mitigation measures Reclamation will implement, aquatic invasive species could be transferred from the Missouri River system to the Hudson Bay Basin as a result of the Project.  Manitoba's Second Supplemental Complaint for Declaratory Judgment and Injunctive Relief at 21-22, ECF No. 221-

5

1.  Missouri objects to the effects that the relatively miniscule withdrawal of water may have on the Missouri River system.[5]  Missouri's First Amended Complaint at 6, ECF No. 222-1.  These concerns were the central focus of Reclamation's Final Supplemental EIS.  2015 AR 2015_107 Page 29 (App. 725).  But the Final Supplemental EIS also confirmed there is no viable alternate water source besides the Missouri River.  Final Supplemental EIS Appendix C – Alternatives Formulation, 2015 AR 2015_103 Page 58-59 (App. 1232-33) .  Following years of study, Reclamation concluded that sources other than the Missouri River would simply not provide enough clean water to meet even the modest needs of the Project communities.  *Id*.

### B.     THE CURRENT NEPA LITIGATION

Reclamation issued an Environmental Assessment and a Finding of No Significant Impact on the Project in 2001.  Finding of No *Significant Impact: Final*

---

[5] The projected annual Project withdrawals would represent approximately 0.019% (less than one fiftieth of one percent) of the storage capacity of Missouri River system reservoirs.  Final Supplemental EIS Appendix D, at 2015 AR 2015_103 Page 87 (App. 1261)  (storage capacity of Missouri River system); Final Supplemental EIS 2015 AR 2015_107 Page 299 (App. 995) (estimated annual Project depletion).  Put in context, if the reservoir system capacity were scaled down to one gallon of water, the annual Project withdrawal would represent less than three drops.  *U. S. Geological Survey Drip Calculator*, http://water.usgs.gov/edu/activity-drip.html (last modified May 2, 2016) (estimating that one gallon of water contains 15,140 drops).  Even if the reservoir system were not being continually replenished by the Missouri River, which it is, the annual Project withdrawals would not be sufficient to drain the reservoirs in five millennia.

*Environmental Assessment for the NAWS Project, May* 18, 2001 (revised Sept. 10, 2001) ("Finding of No Significant Impact"), 2003 AR at 00672-01261. The alternative selected by the agency at that time would have used Missouri River water to supply the Project communities with safe, reliable drinking water. Finding of No Significant Impact, 2003 AR at 675. Construction of certain Project components began in April 2002. Final Supplemental EIS at 2015 AR 2015_107 Page 27 (App. 723). That construction included a buried, closed pipeline running from Max, North Dakota (the location of a proposed water treatment plant to address potential aquatic invasive species) to Minot, North Dakota. *Id.* at 2015 AR 2015_107 Page 47 (App. 743). Manitoba did not file a legal challenge to the 2001 Environmental Assessment and Finding of No Significant Impact until October 2002, six months after Project construction began. *See* Manitoba's Complaint, October 22, 2002, ECF No. 1. Furthermore, Manitoba did not seek a preliminary injunction to halt Project construction. In February 2005, on cross-motions for summary judgment, the District Court remanded the case to Reclamation for further NEPA work on the possibility of pipeline leakage and potential consequences of not fully treating Missouri River water at its source. Memorandum Opinion, February 3, 2005, at 38, ECF No. 87. In April 2005, after further briefing on the merits and proper scope of an injunction, the District Court entered a narrowly tailored injunction permitting construction of certain Project

7

elements to proceed while additional NEPA review was conducted. *See*
Memorandum Opinion and Order, Apr. 15, 2005 ("2005 Injunction Opinion"),
ECF No. 95 (App. 50).

In the 2005 Injunction Opinion, the District Court balanced factors such as
potential harm to the parties and held that "an order enjoining all activity relating
to this project is not appropriate" and that a more tailored remedy should be put in
place. *Id*. at 6 (App. 55).  In particular, the District Court was concerned about the
potential delay in delivering high quality drinking water to the citizens of the
Project communities. *Id*. at 5 (App. 54).  The District Court permitted specific
construction, such as completion of the main pipeline from Max to Minot then
underway, and instructed the defendants to return to the court to demonstrate that
any "proposed additional construction would not influence or alter the agency's
ability to choose between water treatment options." *Id.* at 6 (App. 55).  Between
2005 and 2013, the District Court modified the injunction five times to permit
additional construction or other Project work. *See, e.g*., Minute Entry Order
(March 18, 2008).  This construction allowed the Project communities surrounding
the City of Minot to begin receiving Minot's higher quality water on an interim
basis while they wait for Project water. *See, e.g.,* Final Supplemental EIS at 2015
AR 2015_107 Page 27 (App. 723).

8

Following the District Court's 2005 remand, Reclamation elected to prepare an Environmental Impact Statement. *NAWS Project Final EIS on Water Treatment* (December 2008) ("2008 EIS"), 2009 AR 2008_172. That NEPA process was conducted over the course of three years and resulted in a Record of Decision on January 15, 2009. Record of Decision for the *NAWS Project Final EIS on Water Treatment* (January 15, 2009), 2009 AR 2009_26. The selected alternative again relied on Missouri River water. *Id.* at 2009 AR 2009_26 Page 4. Manitoba filed a Supplemental Complaint regarding the 2008 EIS in March 2009. Manitoba's Supplemental Complaint for Declaratory Judgment and Injunctive Relief, ECF No. 115. More than six years after construction began on the Project, the State of Missouri for the first time filed a complaint alleging defects in Reclamation's analysis regarding Missouri River depletions. State of Missouri's Complaint, *State of Missouri ex rel. Koster v. U.S. Dep't of Interior, Bureau of Reclamation*, 1:09-cv-00373 (D.D.C. Feb. 24, 2009).[6] In March 2010, the District Court again reviewed cross-motions for summary judgment and found that certain key elements of the NEPA review, such as the adequacy of alternatives reviewed and the need for the Project, withstood challenge. *See generally Gov't of Manitoba v. Salazar*, 691 F. Supp. 2d 37 (D.D.C. 2010). However, the District Court again

---

[6] *State of Missouri ex rel. Koster v. U.S. Dep't of Interior, Bureau of Reclamation*, 1:09-cv-00373 was consolidated on March 11, 2009 with the matter filed by Manitoba. Order Consolidating Cases, ECF No. 113 (1:02-cv-02057).

remanded the case to Reclamation for further review of two issues: 1) the possible consequences of potential biota transfer into the Hudson Bay Basin, including Canada; and 2) the cumulative impacts of potential depletions of the Missouri River as a result of the Project. *Id.* at 51-52.

Despite the District Court having limited its remand to two specific issues, Reclamation elected to revisit, revise, and update all prior NEPA analysis. Final Supplemental EIS at 2015 AR 2015_107 Page 23 (App. 719). This work was memorialized in a Draft Supplemental EIS published in June 2014. NAWS Project Draft Supplemental EIS, 2015 AR 2014_165 (App. 235). Public comments were received, including from Manitoba and Missouri, after an extension of the comment period. Final Supplemental EIS Appendix K – Responses to Comments on the Draft Supplemental EIS, 2015 AR 2015_104 (App. 1573). The Final Supplemental EIS was issued in April 2015. Final Supplemental EIS, 2015 AR 2015_107 (App. 697). The new Record of Decision, published in August 2015, selected a Project alternative that would rely primarily on Missouri River water, with supplemental water from in-basin aquifers.[7] Record of Decision at 2015 AR 2015_100 Page 10 (App. 1946).

---

[7] Since both Missouri's and Manitoba's objections to the Project stem from the use of Missouri River water, presumably this litigation would end if in-basin options were chosen as the sole water source. The fact that Reclamation selected Missouri River water as the primary source each time it has reviewed the Project underscores that in-basin options are not sufficient to meet Project needs.

In the Record of Decision, Reclamation committed to a number of mitigation measures to address the risk of potential aquatic invasive species, including moving the water in a closed, buried pipeline with numerous safeguards against leaking and failure. Final Supplemental EIS at 2015 AR 2015_107 Page 47 (App. 743). The most significant mitigation measure, however, is building and operating a biota water treatment plant in Max, North Dakota ("Biota Water Treatment Plant") before the water crosses into the Hudson Bay Basin. Record of Decision at 2015 AR 2015_100 Pages 8-9 (App. 1944-45). The planned Biota Water Treatment Plant will use a sophisticated multi-step process to inactivate potential aquatic invasive species that may be in the water. Final Supplemental EIS at 2015 AR 2015_107 Page 89 (App. 785). It will use the exact technology Appellee Manitoba advocated for, hailing it in 2015 comments on the Final Supplemental EIS as "the most sensible, and most protective" water treatment option for the Project. Record of Decision at 2015 AR 2015_100 Page 40 (App. 1976).

Despite years of familiarity with the Project, Manitoba and Missouri did not file updated complaints until late January 2016, almost six months after the agency published its Record of Decision. Manitoba's Second Supplemental Complaint, ECF No. 221-1; Missouri's Amended Complaint, ECF No. 222-1. Moreover, Manitoba and Missouri would not agree to a briefing schedule that concluded

summary judgment briefing for another six months. Joint Motions to Modify Scheduling Order, ECF Nos. 232 and 235. Summary judgment briefing was scheduled to conclude on August 16, 2016. Minute Order (August 3, 2016). Manitoba's September 12, 2016 request to file a sur-reply re-opened briefing to the extent the District Court is considering permitting additional motions. Manitoba's Motion for Leave to File Surreply in Support of its Cross Motion for Summary Judgment and Continued Injunctive Relief, ECF No. 262; North Dakota's Motion for Leave to File Surreply to Manitoba's Surreply Regarding Summary Judgment or, in the Alternative, Motion for Reconsideration, ECF No. 264; Federal Defendants' Motion for Leave to File Surreply to Plaintiffs' Surreply, or in the Alternative, to Set the Matter for Oral Argument, ECF No. 265.

## C.    NORTH DAKOTA'S MOTION TO MODESTLY AMEND THE EXISTING INJUNCTION

Because the water needs of the Project communities are so dire and because of delays in commencing the most recent summary judgment briefing, on March 1, 2016, North Dakota filed a motion to modify the injunction prior to summary judgment. North Dakota's Motion to Modify the NAWS Project Injunction ("North Dakota's Motion to Modify Injunction"), ECF No. 225 (App. 72). North Dakota sought a very limited injunction modification to allow paper design work of the proposed Biota Water Treatment Plant. *Id*. No construction work was included in the modification request. *Id*. Moreover, no federal resources would be

12

committed to the design work. *Id*. North Dakota would entirely fund the design work, with no federal commitment to repay those funds at any point in the future. North Dakota's Motion to Modify Injunction Exhibit B – Memorandum of Understanding, ECF No. 225-3 (App. 105-07). North Dakota and Reclamation agreed to this arrangement in a February 2016 Memorandum of Understanding. *Id.*

Design work on the Biota Water Treatment Plant will take approximately 86 weeks (approximately 20 months). North Dakota's Motion to Modify Injunction Exhibit A – Freije Declaration (March 1, 2016) ("Freije Declaration"), at ¶ 3, ECF No. 225-2 (App. 103).[8] This design phase will take longer than design of any other part of the Project and is a necessary prerequisite to the design and construction of other Project elements. *Id*. Even if the design work began today, it will still be at least another four years before the Project could deliver reliable, high quality water. *Id*. If design work cannot proceed, every day of delay brings the citizens in northwest North Dakota closer to a water crisis that could last for years.

Following Manitoba's and Missouri's briefs opposing the motion and North Dakota's reply, Manitoba sought leave to file a sur-reply more than three weeks after briefing closed. Manitoba's Opposition, ECF No. 230 (App. 116); Missouri's Memorandum in Opposition to North Dakota's Motion to Modify Injunction

---

[8] Actual construction of the Biota Water Treatment Plant is expected to take an additional two years. Freije Declaration at ¶ 3, ECF No. 225-2 (App. 103).

("Missouri's Opposition"), ECF No. 229 (App. 108); North Dakota's Reply Brief, ECF No. 233 (App. 149). The District Court granted Manitoba's opposed motion for leave to file a sur-reply on May 27, 2016. Minute Order Granting Motion for Leave to File Surreply (May 27, 2016).

On June 14, 2016, after more than 100 pages of briefing, the District Court issued a Minute Order denying North Dakota's Motion to Modify Injunction (ECF No. 225 (App. 72). *See* Minute Order Denying North Dakota's Motion Modify Injunction, June 14, 2016 ("Minute Order") (App. 45). The June 14, 2016 Minute Order reads, in full (with citations to the docket and docket notes omitted):

> MINUTE ORDER denying Motion to Modify. The State of North Dakota asks this Court to further modify an injunction first issued in 2005 "to permit it only to undertake design work for the biota water treatment plant ("Biota WTP") to be located in Max, North Dakota," once a federal Final Environmental Impact Statement (FEIS) has been reviewed and approved. North Dakota assumes its own victory defending the FEIS. Since that briefing has just begun, the Court intimates no view on the matter but sees nothing in the Motion to present either changes in law or facts sufficient to warrant modifying the injunction again now. This motion is denied for the reasons argued by the Province of Manitoba and the State of Missouri. Signed by Judge Rosemary M. Collyer on 6/14/2016.

North Dakota appealed.[9]

---

[9] North Dakota filed an opposed motion for expedited consideration of this appeal, which this Court granted on September 28, 2016. Per Curiam Order (September

## II.   STANDARD OF REVIEW

Where, as here, a district court makes no findings of fact, articulates no legal standards, and offers no legal analysis, the D.C. Circuit affords the district court's decision no deference.  *See Karsner v. Lothian*, 532 F.3d 876, 886 (D.C. Cir. 2008); *In re Rail Freight Fuel Surcharge Antitrust Litig. MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013).  In *Karsner*, the district court denied a motion by minute order.  532 F.3d at 881.  The D.C. Circuit stated that "[a]lthough we usually review a district court's [legal analysis] under the abuse of discretion standard, here we review *de novo* because the district court failed to provide any findings for us to review."  *Id*. at 886 (internal punctuation and citations omitted).  Likewise, in *In re Rail Freight*, the D.C. Circuit held that the deferential "clear error" standard cannot apply when the district court makes "no factual finding to which we could defer."  725 F.3d at 255.  Where a district court "provides only conclusory findings, unsupported by…an explication of the court's reasoning with respect to the relevant facts," no deference is owed on appellate review.  *Lyles v. United States*, 759 F.2d 941, 944 (D.C. Cir. 1985).

Manitoba's prior arguments to this Court about the deferential standards that might typically apply when a court engages in fact-finding and legal analysis are therefore inapposite.  Appellee Manitoba's Motion for Summary Affirmance at 14-

28, 2016), Document #1638101.  On the same day, this Court denied Manitoba and Missouri's motion for summary affirmance of the Minute Order.  *Id*.

15, Document #1632604. North Dakota agrees with Manitoba's prior statements that "[a]s to the underlying legal basis for the ruling…this Court's review is *de novo*." *Id*. at 14 (citing *Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1080 (D.C. Cir. 2012)). Further, where the record demonstrates how a District Court should have ruled on an injunction motion, this Court remands with directions on how to rule. *See, e.g*., *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673-74 (D.C. Cir. 2005) (vacating District Court's ruling on injunction motion and remanding with instructions on how to rule).

## III.  SUMMARY OF ARGUMENT

Appellant North Dakota requested extremely limited relief from the District Court below. North Dakota seeks to undertake paper design work (not construction) of the high-tech Biota Water Treatment Plant that would treat Missouri River water as part of the Project prior to use as a drinking water supply in northwest North Dakota. To properly evaluate North Dakota's motion to modify the injunction, the District Court must first evaluate whether changed circumstances warrant re-consideration of the injunction. *See Horne v. Flores*, 557 U.S. 433, 447 (2009). If so, the Court must then determine whether equity supports the continued application of the injunction using the factors articulated in *Winter*. 555 U.S. at 20.

16

First, North Dakota established changed circumstances sufficient to warrant re-evaluating the scope of injunction. *See, e.g.*, North Dakota's Reply Brief at 4-13, ECF No. 233 (App. 157-66). Much has changed since the District Court issued a full injunction against Project construction in 2013. Reclamation completed a Supplemental EIS that took a hard look at the Project's potential environmental consequences and issued a Record of Decision. Meanwhile, the drinking water situation in the Project communities has edged closer to crisis. Design of the Biota Water Treatment Plant must begin very soon in order to mitigate this pending crisis.

Second, North Dakota demonstrated that, under the *Winter* factors, the equities tip strongly in favor of granting North Dakota the relief it seeks. *See, e.g.*, North Dakota's Motion to Modify Injunction at 11-18, ECF No. 225-1 (App. 91-98). Public interest in ensuring safe and reliable drinking water supplies for tens of thousands of citizens supports modifying the injunction. Moreover, the environmental harm Manitoba and Missouri fear could not possibly flow from commencement of the paper design work North Dakota proposes. Nor could Reclamation's analysis or decision-making be affected by that design work, as the Supplemental EIS and the Record of Decision are already complete. Yet, after 100 pages of briefing on North Dakota's motion to modify the injunction, the District

Court denied the motion in the Minute Order.  The Minute Order engaged in no

fact finding, did not describe any legal standards, and contained no legal analysis.

    The District Court's lack of fact finding and analysis means that the Minute

Order cannot be upheld under D.C. Circuit precedent.  Furthermore, the result the

District Court reached was incorrect and worthy of reversal – not mere vacatur.

Therefore, North Dakota respectfully requests that this panel remand this case and

direct the District Court to grant North Dakota's motion to amend the injunction to

allow paper design work on the Biota Water Treatment Plant.


## IV.    ARGUMENT

    The standard for modifying an injunction requires a "flexible approach."

*Horne*, 557 U.S. at 450.  Under Federal Rule of Civil Procedure 60(b)(5) ("Rule

60(b)(5)"), if a party demonstrates that changed circumstances dictate a

modification to the scope of an injunction, it is reversible error for a district court

to maintain the status quo.  *See id*. at 447.  In *Horne*, the Supreme Court reversed a

lower court ruling denying a state agency relief from an injunction.  The Court

stated that "a court abuses its discretion when it refuses to modify an injunction" in

light of changed circumstances that render continued enforcement of an injunction

no longer equitable.  *Id.* (internal quotations and citation omitted).

    Supreme Court and D.C. Circuit precedent emphasize time and again that

District Courts must be flexible when evaluating requests like North Dakota's.

18

Before the District Court, North Dakota cited cases in which the Supreme Court or this Circuit reversed a lower court's improper failure to modify an injunction or consent decree, *id.* at 434; *Rufo v. Inmates of the Suffolk Cty. Jail*, 502 U.S. 367, 368 (1992); *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011), or affirmed a lower court's modification of a consent decree. *United States v. W. Elec. Co.*, *Inc.*, 46 F.3d 1198, 1207 (D.C. Cir. 1995). It is under this flexible framework that the pending motion to modify the injunction must be considered.

### A.    CHANGED CIRCUMSTANCES DICTATE A RECONSIDERATION OF THE SCOPE OF THE INJUNCTION

Before the District Court, North Dakota offered three independent arguments that changed circumstances merited reconsideration of the scope of the injunction. Namely, the following circumstances have changed: 1) Reclamation completed its NEPA analysis and issued a Record of Decision; 2) North Dakota's water quality and quantity problems have continued to worsen; and 3) it has become increasingly unlikely that Project elements could be designed and constructed before a drinking water crisis develops in the Project communities. *See, e.g.*, North Dakota's Reply Brief at 4-13, ECF No. 233 (App. 157-66). The District Court's June 14, 2016 Minute Order did not address any of these arguments.

The District Court justified its 2013 expansion of the existing narrowly tailored injunction on the basis that further Project work could unduly influence Reclamation's then-ongoing NEPA analysis and ultimate decision about whether, or how, to proceed with the Project. *Gov't of Manitoba v. Salazar*, 926 F. Supp. 2d 189, 192 (D.C. Cir. 2013). But Reclamation's NEPA analysis evaluating the potential impacts of the Project is now complete. Likewise, Reclamation's decision to proceed with the Project, including selection of specific water sources and treatment technologies, has been made. The District Court's original justification for the injunction therefore no longer applies. This Circuit's precedent requires that this new circumstance be evaluated in deciding the motion to modify the injunction. *Petties*, 662 F.3d at 571 (D.C. Circuit reversing a district court for failing to consider in its Rule 60(b)(5) analysis whether the original justification for a long-standing injunction was still sound). The June 14, 2016 Minute Order offers no explanation why completion of the decision-making process was not sufficient to warrant re-examining the injunction in light of North Dakota's limited modification request. Whether completion of the NEPA analysis and issuance of the Record of Decision constitute a changed circumstance is a fully briefed issue that this tribunal can and should address now in the absence of any analysis by the District Court.

20

To the extent that the June 14, 2016 Minute Order contains an implicit assumption that Reclamation's latest round of NEPA work will be found insufficient, the District Court's analysis is fatally flawed.  Precedent dictates that agency actions, including NEPA analyses, be entitled to a presumption of regularity.  *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (holding that the standard of review of agency actions is "a highly deferential one") (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971) (agency action is "entitled to a presumption of regularity") (internal citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  This is true even where a NEPA violation was previously found.  *Pacific Rivers Council v. U.S. Forest Service*, 942 F. Supp. 2d 1014, 1023 (E.D. Cal. 2013) ("[C]ourts cannot assume that because an agency has failed to comply with NEPA in the past, it will fail to do so in the future.") (internal citation omitted).

The decline of Project communities' drinking water quantity and quality constitutes an independent basis for concluding that changed circumstances warrant a modification to the injunction.  As described in Section I.A, existing water sources in the Project communities are being drawn down at unsustainable rates and water quality is worsening.  Each additional day the Project is delayed brings the Project communities closer to a drinking water crisis.

Before the District Court, Manitoba focused on one particularly wet season, which led to unprecedented Souris River flows in 2011. Manitoba's Opposition at 13, ECF No. 230 (App. 133). Viewed in context, as shown in North Dakota's Reply Brief Exhibit D, ECF No. 233-4 (App. 182-83), this catastrophic flooding event can only be reasonably viewed as a historical aberration, as the flooding reached twice the levels ever measured in records dating back to 1904. Following the flood, aquifer levels in the Project communities have already resumed decades-long declines in water levels, including both of the aquifers serving the City of Minot. *See* North Dakota's Reply Brief Exhibit A, ECF No. 233-1 (App. 172-74). Therefore, as North Dakota explained to the District Court, even that historic flooding event did not alter the inexorable decline in Project area aquifers. North Dakota's Reply at 9-10, ECF No. 233 (App. 162-63).

The design and construction of the Biota Water Treatment Plant will be complicated and time-consuming. Even if design work were to begin today, the plant could not be complete until 2020 at the earliest, by which time a drinking water crisis in the Project communities may have already begun. Freije Declaration at ¶ 3, ECF No. 225-2 (App. 103). Further urgency arises from the fact that budgeting for North Dakota's 2017-19 fiscal biennium is currently underway. *Id*. at ¶ 4 (App. 103-04). The Legislative Assembly will likely be reluctant to fund design work while a full injunction is still in place, especially in

light of tightening state budgets.  *Id*.  If funding for the design work cannot be

obtained during the 2017-19 biennium, completion of the Biota Water Treatment

Plant would be delayed until at least late 2022, an untenable public health and

safety proposition considering the Project communities' declining drinking water

situation.  *Id.*  The foreseeable improbability of completing the design and

construction of the Project prior to the onset of a drinking water crisis in the

Project communities constitutes a changed circumstance.

### B.     EQUITABLE FACTORS TIP HEAVILY TOWARDS ALLOWING NORTH DAKOTA THE MODEST RELIEF IT SEEKS

Under Rule 60(b)(5), once changed circumstances have been demonstrated,

the analysis turns to the equity of continued enforcement.  *Horne*, 557 U.S. at 447.

In the case of injunctive relief pending resolution of a case, the equity factors a

court is required to consider have been enumerated in *Winter*.  555 U.S. at 20.[10]

Under *Winter*, injunctive relief is appropriate only if each of the following weigh

in favor of the proponent of the injunction: 1) whether the proponent is likely to

---

[10] In briefing before the District Court, Manitoba has argued that *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), not *Winter*, should govern the Court's analysis as to the proper scope of the injunction because, Manitoba argued, the injunction is permanent, not preliminary, in nature.  Manitoba's Memorandum in Response to the Court's Order to Show Cause Regarding Modification of Injunction at 5, ECF No. 201.  As North Dakota pointed out subsequently, this issue is a red herring because – with the exception that *Monsanto* does not require a showing of probable success on the merits – the other factors are essentially identical to *Winter*.  North Dakota's Reply Memorandum Regarding the Court's Order to Show Cause Regarding Modification of Injunction at 4, ECF No. 204.

suffer irreparable harm in the absence of injunctive relief; 2) whether the balance of the equities tips in the proponent's favor; 3) whether the injunction is in the public interest; and 4) whether it is likely the proponent will succeed on the merits. *Id*. All factors must support the continued injunction in order for North Dakota's modification request to be denied. Instead, North Dakota demonstrated to the District Court that *all* of the *Winter* factors tipped in North Dakota's favor. The District Court erred by failing to engage in any fact-finding or legal analysis with respect to each of the equity factors, thereby requiring this Court's *de novo* review. As explained below, the District Court's denial of North Dakota's motion was in error and should be reversed.

### 1.    Plaintiffs Will Suffer No Harm from the Paper Design Work North Dakota Proposes

In order to justify a continued injunction on the design work on the Biota Water Treatment Plant, there must be a finding that it is "likely" – not merely possible – that Manitoba or Missouri will suffer "irreparable harm" absent the injunction. *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (emphasis added). The potential injury "must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Since Biota Water Treatment Plant design work would not cause any of the possible harms alleged by Manitoba and Missouri, the modest relief requested in North Dakota's motion is squarely consistent with this analytical prong. *See, e.g.*, *Detroit Int'l Bridge Co. v. Gov't of Canada*, 53 F. Supp. 3d 1, 17-19 (D.D.C. 2014) (denying injunction on paper exercise because only actual construction activities could cause the potential harm alleged by plaintiffs); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 203-06 (4th Cir. 2005) (holding that an injunction, pending further NEPA work, must be narrowed to allow preliminary project work that "do[es] not include cutting even a single blade of grass in preparation for construction"). Both Manitoba's concern that the Project could contribute to biota transfer across the continental divide and Missouri's concern about withdrawals from the Missouri River only relate to activities that would follow actual construction, not mere design work. There is no scenario under which design work may cause environmental harm that is "actual and not theoretical." *Wisconsin Gas Co.,* 758 F.2d at 674.

Even if additional NEPA work becomes necessary, the amount of money that would be spent on the proposed design work between now and the resolution of the pending litigation is negligible when compared to the total anticipated Project budget. The design work on the Biota Water Treatment Plant would cost less than $5 million, which would accrue at the rate of approximately $1.5 million

per six months.  Freije Declaration at ¶ 5, ECF No. 225-2 (App. 104).  Therefore, it

is likely that only a fraction of the $5 million would be spent by the time the

District Court makes a summary judgment ruling.  By comparison, the total Project

cost is estimated at $244 million.  Final Supplemental EIS at 2015 AR 2015_107

Page 99 (App. 795).  Of this amount, approximately $110 million has already been

spent, either prior to Manitoba's original request for a preliminary injunction or

with the District Court's specific approval under the narrowly tailored injunction

that existed from 2005 to 2013.  *Id*.  Any arguments about momentum, sunk costs,

or tipping points as a result of the relatively minor expenditure at issue ring hollow.

Regardless, the Biota Water Treatment Plant design work improperly

influencing a theoretical future NEPA review is hypothetical.  Therefore, it does

not meet the *Winter* standard that irreparable injury must be likely, not merely

possible.  *Winter*, 555 U.S. at 22.  Hypothetical concerns about an additional

NEPA process that may never occur do not carry weight against the real and

ongoing needs of North Dakotans.  No reasonable basis exists for Manitoba and

Missouri to assert that improper influence on a hypothetical future NEPA process

is either likely or irreparable should North Dakota be permitted to pay for

engineers to sit behind their desks to design a Biota Water Treatment Plant.  North

Dakota has demonstrated no irreparable harm can come from the requested design

work.

## 2.     The Balance of Equities Tips Towards North Dakota

The balance of the equities tips strongly against Manitoba and Missouri, providing independent reason that the injunction should be modified.  *Winter*, 555 U.S. at 20.  When balancing equities, courts weigh "the hardship that will befall the [enjoined party] if the injunction issues contrasted with the hardship that will befall the [injunction proponent] if the injunction does not issue."  *Mercado-Salinas v. Bart Enters. Int'l, Ltd.*, 671 F.3d 12, 19 (1st Cir. 2011).  The more "certain and substantial" a hardship, the more it should weigh in a court's analysis.  *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).

As discussed above, if the existing full injunction on the Project is modified to allow design work on the Biota Water Treatment Plant, Manitoba and Missouri will suffer *no* hardship.  Likewise, the concern that additional expenditures would influence any future NEPA work is hypothetical, and therefore, is an uncertain and theoretical "hardship."  On the other hand, if the injunction remains in place without amendment, North Dakota would suffer certain and substantial hardship in the form of further unnecessary, and potentially years-long, delays in the solution to the drinking water problems in the Project communities.  The driving force behind the Project is that citizens in the Project communities are suffering from problems of both poor water quality and quantity.  North Dakotans in the Project communities suffer certain and substantial hardship every day their access to

27

higher quality and reliable drinking water is delayed.  Manitoba and Missouri bear

no comparable hardship.

### 3.    Modifying the Injunction Would be in the Public Interest

In order to justify enjoining an activity, there must be a showing that the

injunction is in the public interest.  *Winter*, 555 U.S. at 20, 24 ("[C]ourts of equity

should pay particular regard for the public consequences in employing the

extraordinary remedy of injunction.") (internal citations omitted).  A continued

injunction on design work for the Biota Water Treatment Plant would serve no

public interest and would, in fact, cause considerable public detriment by

unnecessarily delaying – perhaps by years – the delivery of an ample supply of

clean water to the Project communities.  Furthermore, public interest in NEPA-

compliant decision-making would not be harmed if the Biota Water Treatment

Plant design work begins.  Decision-making is complete, and the amount of money

involved in designing the Biota Water Treatment Plant is miniscule in the overall

context of the Project.  *See* Section IV.B.1.  Thus, the District Court's concern

when it issued a full injunction on the Project that the NEPA work could be

impacted does not apply to the proposed Biota Water Treatment Plant design work.

Nor could Manitoba or Missouri prevail in arguing that the very existence of

NEPA procedural requirements designed to serve the public interest tips this factor

in their favor.  In *Monsanto*, for example, although all parties agreed that the

defendant agency had violated NEPA, the Supreme Court held that the district court's injunction did not satisfy the public interest requirement. *Monsanto*, 561 U.S. at 159 (injunction satisfied "none of the…four factors"). To be clear, North Dakota agrees that NEPA's procedural requirements are intended to serve the public interest. However, those generalized interests in NEPA's procedural requirements are adequately protected by the existing injunction against actual construction activities. Because maintaining the full injunction will create more, rather than less, harm to the public while providing no environmental benefit, the public interest lies in modifying the injunction.

### 4.    There is No Substantial Likelihood Manitoba and Missouri Will Prevail on the Merits

There must also be a "substantial likelihood" that Manitoba or Missouri will succeed on the merits in order to support enjoining an activity pending litigation. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). The "merits" at issue here involve compliance with the procedural requirements of NEPA, not a particular substantive outcome. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("the agency is not constrained by NEPA from deciding that other values outweigh…environmental costs" (internal citations omitted)). Reclamation spent years taking a hard look at the Project, and the Final Supplemental EIS and Record of Decision are complete. Reclamation's work was so thorough that Manitoba and Missouri abandoned a

29

number of their claims during summary judgment briefing.  North Dakota's Combined Reply in Support of Motion for Summary Judgment and Opposition to Plaintiffs' Cross-Motions for Summary Judgment at 4-5, ECF No. 251.  This includes one of the two key issues the District Court asked Reclamation to consider on remand – the potential consequences of aquatic invasive species transfer to the Hudson Bay Basin.  *Id.*

As with any agency action pursuant to NEPA, Reclamation's Supplemental EIS is entitled to a presumption of regularity.  *See* Section IV.A.  With Manitoba and Missouri facing this deferential standard of review, and after Reclamation's thorough analysis reflected in the Supplemental EIS and supporting administrative record, Manitoba and Missouri do not have a "substantial likelihood" of success on the merits.

In order for a continued full injunction to be justified despite changed circumstances, all four *Winter* factors must tip in Missouri's and Manitoba's favor.  However, North Dakota has demonstrated that due to the Project communities' severe drinking water problems and the modest nature of North Dakota's injunction modification request, none of the factors tip in Missouri's and Manitoba's favor.  Equity therefore demands that the injunction be modified.

30

## V. CONCLUSION

When considering North Dakota's motion, the District Court failed to engage in any fact-finding or legal analysis. This panel must therefore review the result *de novo*. For the reasons described above, North Dakota has demonstrated that, due to changed circumstances, equity demands that the existing injunction be slightly amended to allow paper design work on the Biota Water Transfer Plant to proceed. North Dakota respectfully requests that this panel remand the case to the District Court with instructions to grant North Dakota's motion.

/s/ Nessa Horewitch Coppinger
Nessa Horewitch Coppinger
D.C. Bar No. 477467
Fred R. Wagner
D.C. Bar No. 416009
Special Assistant Attorneys General
1350 I Street, NW Suite 700
Washington, DC 20005-3311
Phone: (202) 789-6053
Fax: (202) 789-6190
Emails: ncoppinger@bdlaw.com
        fwagner@bdlaw.com

Jennifer L. Verleger
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501
Phone: (701) 328-3640
Fax: (701) 328-4300
Email: jverleger@nd.gov

*Attorneys for Appellant*
*State of North Dakota*

## FED. R. APP. P. 32(A)(7)(C) CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

   this brief contains 7,305 words, excluding the parts of the brief

   exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportionally spaced typeface using

   Microsoft Word 2010 in 14-point font, Times New Roman.

Date: December 6, 2016

/s/ Nessa Horewitch Coppinger
Nessa Horewitch Coppinger
D.C. Bar No. 477467
Special Assistant Attorney General
1350 I Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 789-6053
Fax: (202) 789-6190
Email: ncoppinger@bdlaw.com

*Attorney for Appellant*
*State of North Dakota*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2016, I electronically filed the

foregoing North Dakota's Opening Brief with the Clerk of Court using ECF.  I also

certify that the foregoing document is being served this day on all counsel of

record via transmission of Notice of Electronic Filing generated by ECF and by

first-class mail.

/s/ Nessa Horewitch Coppinger
Nessa Horewitch Coppinger
D.C. Bar No. 477467
Special Assistant Attorney General
1350 I Street NW, Suite 700
Washington, DC 20005
Tel.: (202) 789-6053
Fax: (202) 789-6190
Email: ncoppinger@bdlaw.com

*Attorney for Appellant*
*State of North Dakota*

34

**ADDENDUM: STATUTES, REGULATIONS AND RULES**

## Addendum Table of Contents

**Pertinent Statutes, Regulations and Rules**                    **Page**

28 U.S.C. § 1292                                                  A-3

28 U.S.C. § 1331                                                  A-6

28 U.S.C. § 1337                                                  A-7

28 U.S.C. § 1361                                                  A-8

40 C.F.R. § 141.62(b)(16)                                         A-9

Fed. R. Civ. P. 60                                                A-16

## 28 U.S.C.A. § 1292

### § 1292. Interlocutory decisions

**(a)** Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

**(1)** Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

**(2)** Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

**(3)** Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

**(b)** When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

A-3

**(c)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction--

    **(1)** of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

    **(2)** of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

**(d)(1)** When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(2)** When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(3)** Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

**(4)(A)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

**(B)** When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

**(e)** The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

**28 U.S.C.A. § 1331**

§ 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C.A. § 1337

§ 1337. Commerce and antitrust regulations; amount in controversy, costs

**(a)** The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies: *Provided, however*, That the district courts shall have original jurisdiction of an action brought under section 11706 or 14706 of title 49, only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

**(b)** Except when express provision therefor is otherwise made in a statute of the United States, where a plaintiff who files the case under section 11706 or 14706 of title 49, originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of any interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

**(c)** The district courts shall not have jurisdiction under this section of any matter within the exclusive jurisdiction of the Court of International Trade under chapter 95 of this title.

## 28 U.S.C.A. § 1361

§ 1361. Action to compel an officer of the United States to perform his duty

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

## 40 C.F.R. § 141.62

§ 141.62 Maximum contaminant levels for inorganic contaminants.

(a) [Reserved]

(b) The maximum contaminant levels for inorganic contaminants specified in paragraphs (b)(2)–(6), (b)(10), and (b)(11)–(16) of this section apply to community water systems and non-transient, non-community water systems. The maximum contaminant level specified in paragraph (b)(1) of this section only applies to community water systems. The maximum contaminant levels specified in (b)(7), (b)(8), and (b)(9) of this section apply to community water systems; non-transient, non-community water systems; and transient non-community water systems.

| Contaminant | MCL (mg/l) |
| --- | --- |
| (1) Fluoride | 4.0 |
| (2) Asbestos | 7 Million Fibers/liter (longer than 10 µm). |
| (3) Barium | 2 |
| (4) Cadmium | 0.005 |
| (5) Chromium | 0.1 |
| (6) Mercury | 0.002 |
| (7) Nitrate | 10 (as Nitrogen) |

A-9

(8) Nitrite ...................................................    1 (as Nitrogen)

(9) Total Nitrate and Nitrite ............................    10 (as Nitrogen)

(10) Selenium ..........................................    0.05

(11) Antimony ..........................................    0.006

(12) Beryllium ..........................................    0.004

(13) Cyanide (as free Cyanide) .......................    0.2

(14) [reserved] .........................................

(15) Thallium ...........................................    0.002

(16) Arsenic ............................................    0.010

c) The Administrator, pursuant to section 1412 of the Act, hereby identifies the following as the best technology, treatment technique, or other means available for achieving compliance with the maximum contaminant levels for inorganic contaminants identified in paragraph (b) of this section, except fluoride:

## BAT FOR INORGANIC COMPOUNDS LISTED IN SECTION 141.62(b)

| Chemical Name | BAT(s) |
|---|---|
| Antimony ............................................... | 2,7 |
| Arsenic[4] ............................................... | 1, 2, 5, 6, 7, 9, 12[5] |
| Asbestos ............................................... | 2,3,8 |
| Barium ............................................... | 5,6,7,9 |
| Beryllium ............................................... | 1,2,5,6,7 |
| Cadmium ............................................... | 2,5,6,7 |
| Chromium ............................................... | 2,5,6[2],7 |
| Cyanide ............................................... | 5,7,13 |
| Mercury ............................................... | 2[1],4,6[1],7[1] |
| Nickel ............................................... | 5,6,7 |
| Nitrate ............................................... | 5,7,9 |
| Nitrite ............................................... | 5,7 |

A-11

Selenium ............................................. 1,2[3],6,7,9

Thallium.............................................. 1,5

---

Key to BATS in Table

1=Activated Alumina

2=Coagulation/Filtration (not BAT for systems < 500 service connections)

3=Direct and Diatomite Filtration

4=Granular Activated Carbon

5=Ion Exchange

6=Lime Softening (not BAT for systems <500 service connections)

7=Reverse Osmosis

8=Corrosion Control

9=Electrodialysis

10=Chlorine

A-12

11=Ultraviolet

12=Oxidation/Filtration

13=Alkaline Chlorination (pH $\geq$ 8.5)

(d) The Administrator, pursuant to section 1412 of the Act, hereby identifies in the following table the affordable technology, treatment technique, or other means available to systems serving 10,000 persons or fewer for achieving compliance with the maximum contaminant level for arsenic:

**Small System Compliance Technologies (SSCTs)[1] for Arsenic[2]**

| Small system compliance technology | Affordable for listed small system categories[3] |
|---|---|
| Activated Alumina (centralized) .................... | All size categories. |
| Activated Alumina (Point-of-Use)[4] .............. | All size categories. |
| Coagulation/Filtration[5]..................................... | 501-3,300, 3,301-10,000. |
| Coagulation-assisted Microfiltration ............. | 501-3,300, 3,301-10,000. |
| Electrodialysis reversal[6]................................... | 501-3,300, 3,301-10,000. |
| Enhanced coagulation/filtration...................... | All size categories |

A-13

Enhanced lime softening (pH> 10.5) ............      All size categories.

Ion Exchange ........................................................      All size categories.

Lime Softening[5] ..................................................      501-3,300, 3,301-10,000.

Oxidation/Filtration[7] ..........................................      All size categories.

Reverse Osmosis (centralized)[6] ......................      501-3,300, 3,301-10,000.

Reverse Osmosis (Point-of-Use)[4]...................      All size categories.

---

Current through September 29, 2016; 81 FR 66865.

Footnotes

[1]      BAT only if influent Hg concentrations ≤10μg/1.

[2]      BAT for Chromium III only.

[3]      BAT for Selenium IV only.

[4]      BATs for Arsenic V. Pre-oxidation may be required to convert Arsenic III to Arsenic V.

[5]      To obtain high removals, iron to arsenic ratio must be at least 20:1.

[1]      Section 1412(b)(4)(E)(ii) of SDWA specifies that SSCTs must be affordable and technically feasible for small systems.

A-14

2    SSCTs for Arsenic V. Pre-oxidation may be required to convert Arsenic III to Arsenic V.

3    The Act (ibid.) specifies three categories of small systems: (i) those serving 25 or more, but fewer than 501, (ii) those serving more than 500, but fewer than 3,301, and (iii) those serving more than 3,300, but fewer than 10,001.

4    When POU or POE devices are used for compliance, programs to ensure proper long-term operation, maintenance, and monitoring must be provided by the water system to ensure adequate performance.

5    Unlikely to be installed solely for arsenic removal. May require pH adjustment to optimal range if high removals are needed.

6    Technologies reject a large volume of water—may not be appropriate for areas where water quantity may be an issue.

7    To obtain high removals, iron to arsenic ratio must be at least 20:1.

A-15

## Federal Rules of Civil Procedure Rule 60

### Rule 60. Relief From a Judgment or Order

**(a) Corrections Based on Clerical Mistakes; Oversights and Omissions.** The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

**(1)** mistake, inadvertence, surprise, or excusable neglect;

**(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

**(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

**(4)** the judgment is void;

**(5)** the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

A-16

**(6)** any other reason that justifies relief.

**(c) Timing and Effect of the Motion.**

**(1)** *Timing.* A motion under Rule 60(b) must be made within a reasonable time-- and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

**(2)** *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

**(d) Other Powers to Grant Relief.** This rule does not limit a court's power to:

**(1)** entertain an independent action to relieve a party from a judgment, order, or proceeding;

**(2)** grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or

**(3)** set aside a judgment for fraud on the court.

**(e) Bills and Writs Abolished.** The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

A-17